IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRANDON ADAMS, | ) | |
| AIS # 227841, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-11-MHT-CSC |
| | ) | (WO) |
| | ) | |
| PATRICE RICHIE, WARDEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

On January 4, 2019, the Plaintiff, Brandon Adams, a state inmate, filed this 42 U.S.C. § 1983 action wherein he challenges his period of confinement in segregated housing while incarcerated at Bullock Correctional Facility. *Adams* I at Doc. 1.[1] Specifically, the Plaintiff alleges that the individual Defendants, the Alabama Department of Corrections and Wexford Health Authority subjected him to cruel and unusual punishment when they kept him, an inmate with a mental health classification, in segregation from September 25, 2018[2], until November 26, 2019. He also alleges that the Defendants acted with deliberate indifference when they denied him adequate medical treatment for his mental health condition during his confinement in segregation.

---

[1] On the same day, the Plaintiff filed a sister action in this court raising the same claims against different defendants, *Adams v. Babers,* 19-cv-16-MHT-CSC, ("*Adams* II"). This action was consolidated with the instant action by Order of January 10, 2019. *See, Adams* I, Doc. 4 and *Adams* II, Doc. 7.

[2] The undisputed documentary evidence demonstrates that the Plaintiff was assigned to restrictive housing beginning on September 28, 2018, following his discharge from the stabilization unit where he was housed and monitored beginning on September 25, 2018. *See* Doc. 34-2 at para. 15; Doc. 34-5 at para. 7 and Doc. 34-8 at para. 17.

*Adams* I and II, Doc. 1 at pp. 2-3.  He names as Defendants the Alabama Department of Corrections and employees of the ADOC who were working at Bullock at the time of Plaintiff's Complaint. These employees include the following: Patrice Richie, Warden III; Gwendolyn Baber, Warden II; Warden McClain, Warden I; Captain McCovery; Sgt. Clemons, Commander of the Restrictive Housing Unit; Mary Collins, Psychological Associate; Mr. Boyd, Classification Specialist Supervisor, and Ms. Parker, Classification Specialist.  *Adams* I and *Adams* II, Doc. 1 at p. 2.  He also names as Defendants Wexford Health Services and Kenton Turner, Wexford mental health professional, who was also employed at Bullock at the time of Plaintiff's Complaint.  *Id.*  He does not specifically state whether he sues the Defendants in their individual or official capacities.  He seeks money damages.  *Adams* I and *Adams* II, Doc. 1 at p. 4.

The Defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits, addressing the claims raised in the complaint.  Docs. 15 and 34.  In these documents, the Defendants maintain they did not act with deliberate indifference to Adams' medical needs and deny they subjected Adams to cruel and unusual punishment by housing him in segregation.  *Id.* The Defendants also raise the defense of exhaustion in their special reports.  *Id.* Indeed, the Prison Litigation Reform Act ("PLRA") requires that "inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit."  *Jones v. Bock,* 549 U.S. 199, 202 (2007).  Thus, the Defendants argue that because the Bullock Correctional Facility utilizes a grievance procedure, and the Plaintiff failed to file any grievance underlying the allegations of his complaint, he has failed to exhaust his administrative remedies and his claims are barred.  *Id.*

After reviewing the special reports filed by the Defendants, the court issued an order on July 6, 2019, directing Adams to file a response to each of the arguments set forth by the

Defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  Doc. 35.  The order specifically cautioned that "**unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 35 at p. 3.  Adams filed a sworn response to this order on July 10, 2019, Doc. 40.

## II.  STANDARD OF REVIEW

Based on the foregoing, the court deems it appropriate to treat the special report filed by the Defendants as a motion to dismiss with respect to the exhaustion defense.  Thus, this case is now pending on the Defendants' motion to dismiss.  *Bryant v. Rich*, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (internal quotations omitted) ("[A]n exhaustion [defense]. . . is not ordinarily the proper subject for a summary judgment [motion]; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."); *Trias v. Florida Dept. of Corrections*, 587 F. App'x 531, 534 (11th Cir. 2014) (holding that the district court properly construed defendant's "motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies[.]").  However, to the extent that the court concludes that the Plaintiff has properly exhausted his administrative remedies as to any claim, the court will address the merits of those claims on summary judgment.

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any

material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

## III. FACTS

In the *Adams* I and *Adams* II Complaints, Plaintiff alleged that the Defendants violated his rights under the Eighth Amendment to the United States Constitution by housing him in Bullock's restrictive housing unit between September 25, 2018, and November 26, 2018. *See, Adams* I Complaint at pp. 2-3; *Adams* II Complaint at pp. 2-3. Plaintiff alleged that he should not have been housed in restrictive housing for that length of time because he had been assigned a mental health code of 2 ("MH-2"). *Id.* Additionally, the Plaintiff claims that he was denied

adequate mental health care while housed in segregation. *Id*. Defendant Clemons, Commander of Restrictive Housing at Bullock, testified by affidavit that ADOC policy generally does not prohibit housing an inmate with an MH-2 in restrictive housing.  Doc. 34-5 at p. 4.  Rather, he testified ADOC policy generally provides that an inmate with a serious mental illness ("SMI") should not be placed in restrictive housing for extended periods of time absent extenuating circumstances.  *Id.*  He confirmed that between September 25, 2018, and November 26, 2018, Plaintiff did not have an SMI designation.  *Id.*  Defendant Warden Babers, whose job duties included determining an inmate's placement in and release from restrictive housing, confirmed Clemons' testimony about ADOC policy.  Doc. 34-2 at pp. 2-3.  She further stated no one reported to her that Adams suffered from an SMI between September 25, 2018, and November 26, 2018. *Id.*

On September 25, 2018, the Plaintiff was admitted to the stabilization unit following an evaluation by a certified registered nurse practitioner on the mental health staff who diagnosed him with adjustment disorder with depressed mood, placed him on the mental health caseload for observation, and recommended his admission to the stabilization unit. Doc. 15-1 at pp. 28-29, 41.  Adams was discharged from the stabilization unit after a psychiatrist on the mental health staff evaluated Adams on September 28, 2018.   Doc. 15-1 at p. 66. As reflected in the psychiatrist's notations for this evaluation, Adams exaggerated his mental health complaints for the purpose of "avoiding seg time" and asked to be discharged from the stabilization unit.  *Id.* The psychiatrist concluded Adams exhibited only mild symptoms of his mental health condition and discharged him. *Id.*

 It is undisputed that members of the mental health staff assessed Plaintiff on multiple occasions between September 25, 2018, and November 26, 2018, and confirmed that he did not

have a serious mental illness. Doc. 34-8 at pp. 8-9; Doc. 15-1 at pp. 4-6; 86-88. Indeed, a nurse on the mental health staff saw Adams on September 28, 2018, and approved his placement in restrictive housing. Doc. 34-8 at p. 6; Doc. 15-1 at p. 83. Further, a licensed mental health professional on the mental health staff assessed Adams on October 5, 2018. Doc. 34-8 at p. 7; Doc. 15-1 at pp. 86-88. The notations for the October 5, 2018, assessment indicate that the mental health professional concluded that Adams was stable on that date and was showing no signs of distress. Doc. 15-1 at pp. 86-88. Adams denied any suicidal thoughts. *Id*. Also, the mental health professional noted that Adams did not have a serious mental illness. *Id*.

Following the October 5, 2018, assessment, the mental health professional cleared Adams for continued housing in restrictive housing. *Id.* at 88. Furthermore, the record before the Court confirms that the members of the mental health staff never recommended that he receive alternative housing due to any ill effects on his mental health. Doc. 34-8 at pp. 7-8 and 18-29; Doc. 34-2 at pp. 9-10; Doc. 34-1 at p. 8; Doc. 15-1 at pp. 2-7, 83, and 86-88. Finally, Wexford mental health professional, Defendant Kenton Turner, confirmed that Adams "was regularly assessed and his mental health needs were closely monitored" while at Bullock. Doc. 15-1 at p. 6. He further opined that "Adams at all times received mental health care within the standard of care of mental health professionals." *Id.*

Defendant Mary Collins[3], who is employed as a Psychological Associate II at Bullock and served on the Restrictive Housing Review Board[4], testified by affidavit that she likewise

---

[3] Collins explained that she is not employed by Wexford and does not serve as a member of the Bullock Mental Health Staff. Nor does she provide healthcare services to inmates at Bullock who are on the mental health case load. Rather, Wexford provides professional mental health staff to Bullock. Doc. 34-8 at p. 2.

[4] The following people participated in the Restrictive Housing Review Board 's meetings as a routine matter: (1) the Warden II, or designee; (2) the Chaplain; (3) a member of the mental health staff who is employed by Wexford; and (4) the Psychological Associate II. A Classification Specialist and a correctional officer who served as the restrictive housing commander also typically attended the

concluded Plaintiff did not suffer from an SMI during this time.  Specifically, she explained she conducted rounds in Bullock's restrictive housing unit approximately twice a week and completed logs in conjunction with these rounds.  Doc. 38-4 pp. 3 and 18-29.  She stated that she routinely observed Adams during these rounds and, to the extent he would speak with her, she interacted with him. Doc. 34-8 at pp. 3 and 9-10.  Indeed, Collins and other Defendants who had contact with the Plaintiff during this time, including those who served on the Restrictive Housing Review Board, testified that Adams never complained to them about his mental health care or the effect of his housing on his mental health.  Nor did any of their contact with Adams indicate that his mental health was suffering due to his placement in restrictive housing.  Docs. 34-1 at p. 5, 34-2 at p. 5, 34-3 at p. 4, 34-4 at p. 3, 34-5 at p. 6, 34-6 at pp. 6 and 11, 34-7 at p. 5, 34-8 at p. 9.

Specifically, Defendant Clemons, who served as the Commander of Restrictive Housing, testified that his duties included walking through the restrictive housing unit multiple times during each shift.  Specifically, he testified that between September 28, 2018, and November 26, 2018, he made numerous rounds through the restrictive housing unit and during that time

---

Restrictive Housing Review Board's meetings but did not participate in the decision-making process.

The Restrictive Housing Review Board typically met every Wednesday. In conjunction with the weekly meeting, the Restrictive Housing Review Board walked through Bullock's restrictive housing unit and observed the inmates housed in the unit. During the Restrictive Housing Review Board's rounds through the restrictive housing unit, the inmates received an opportunity to express any concerns related to their housing. The mental health representative from Wexford spoke with any inmate who voiced a concern related to the inmate's mental health. After completing the round through the restrictive housing unit, members of the Restrictive Housing Review Board met to discuss whether to recommend an inmate's release from restrictive housing in light of the inmate's circumstances.  The Restrictive Housing Review Board may recommend transferring an inmate out of restrictive housing, but the warden would make the final decision regarding releasing the inmate based on the need to ensure the safe, secure operation of the facility. Doc. 34-6 at p. 4.

Adams never expressed any concern to him regarding his mental health, never requested additional mental health care and never indicated that he required a transfer out of restrictive housing due to his mental health. 34-5 at p. 6. Furthermore, Clemons testified he never observed any indication that Adams's mental health suffered or declined as a result of being in restrictive housing or for any other reason. *Id.* Additionally, he confirmed that Adams saw members of the mental health staff on numerous occasions and received multiple out-of-cell visits with members of the mental health staff between September 28, 2018, and November 26, 2018. Specifically, he testified, that Defendant Collins, or a member of the Bullock mental health staff completed rounds through the restrictive housing unit every business day. 34-5 at p.7.

Collins further testified that she is familiar with the diagnostic criteria for an SMI laid out in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V").[5] Doc. 34-8 at pp. 8-9. Under the DSM-V criteria, certain mental health diagnoses are categorically an SMI. Someone may also receive an SMI designation based on the level of their functionality even if they do not have a categorical SMI diagnosis. She stated that in her opinion, Adams did not have an SMI during the period of time he was housed in the stabilization unit or in restrictive housing. *Id.* Indeed, she recognized that on September 25, 2018, the nurse practitioner on the mental health staff diagnosed Plaintiff with adjustment disorder with depressed mood. Doc. 34-8 at pp. 8-9; Doc. 15-1, at pp. 28-29. However, Collins testified that this diagnosis did not fit the criteria for a categorical SMI. Doc. 34-8 at p. 9. In addition, she testified that based on her personal observation and clinical judgment, Adams functioned on a high level between September 28,

---

[5] The American Psychiatric Association publishes the DSM-V as a standard criteria for classifying mental health disorders.

2018, and November 26, 2018. Thus, she also concluded that Plaintiff did not suffer from a functional SMI. *Id*.

The undisputed evidence before the court demonstrates that the ADOC and the members of the Bullock correctional staff found it necessary to place Plaintiff in restrictive housing following his release from the stabilization unit to ensure the safety of the other inmates at Bullock and the secure operation of the facility. Doc. 34-2 at pp. 6-8; Doc. 34 -1 at pp. 4-6; Doc. 34-5 at p. 8. Indeed, Plaintiff committed numerous violent assaults and other disciplinary infractions in the months prior to his September 28, 2018, placement in restrictive housing. *Id*; Doc. 34-1 at pp. 11-59. Specifically, on October 11, 2018, Adams was found guilty of stabbing another inmate in the back with a handmade knife on September 3, 2018.[6] Doc. 34-1 at pp. 11-59. On August 14, 2018, Adams was found guilty of assaulting another innate and being in an unauthorized area when Adams, along with several other inmates allegedly associated with the Crips gang, attacked a sleeping inmate. *Id*. On May 23, 2018, Adams was found guilty of intentionally creating a security hazard after a correctional officer discovered that Adams had sold drugs to another inmate and then intimidated the inmate when he was unable to pay. *Id.* Additionally, the records confirm eleven other infractions committed by Adams, most of them involving attacks on other inmates, in the twelve years prior to the filing of this complaint. *Id.*; Doc. 34-1 at pp. 11-59.

Defendant Warden Babers testified by affidavit that as a direct result of Adams's extensive disciplinary history, in September 2018 members of ADOC's Classification Division initiated the process of reclassifying Adams's custody status to close custody. Doc.

---

[6]  The Plaintiff does not raise any claim based on the deterioration of his mental health prior to September 25, 2018. Defendant Turner testified that following Adams' September 3 attack on another inmate, he was placed in restrictive housing. Turner further testified that on September 3, 2018, the date he was placed in segregation, the Plaintiff had a "general population status (MH-O)." Doc. 15-1 at p. 4.

34-2 at pp. 8-9. She stated that the security of other the prisoners and the safe operation of Bullock required Adams' initial placement in restrictive housing. *Id.* at p. 10. She also testified that while Adams was housed in restrictive housing, no one recommended to her that he be transferred to different housing. *Id.* She further explained that generally she would not approve releasing an inmate from restrictive housing while a reclassification to close custody was pending. Following a reclassification hearing on October 1, 2018, ADOC's Central Review Board reclassified Adams' custody to close on October 17, 2018. *Id.*

Defendant Brandon Boyd, who is employed at Bullock as Classification Specialist Supervisor and who also participated in the Restrictive Housing Review Board's process concerning Adams, testified by affidavit about his participation in Adams' custody classification process. Doc. 34-6 at pp. 6-9. Indeed, he states that he interacted with Adams during the process of reviewing his custody and security classification, which was initiated in September 2018, due to multiple major disciplinary infractions committed by him in the months preceding September 2018. *Id.*; Doc. 34-1 at pp. 11-59.

Specifically, Boyd served as the hearing officer at Adams' reclassification hearing on October 1, 2018. Doc. 34-6 at pp. 9-10, 16. As the hearing officer, he moderated the proceedings and allowed Adams the opportunity to speak. Defendant Simone Parker, a Classification Specialist at Bullock, presented evidence at the reclassification hearing of Adams's recent disciplinary history. Adams chose not to present any evidence at the reclassification hearing. Adams's disciplinary history and classification summary confirm that he assaulted three (3) different inmates on three (3) different occasions within a period of six (6) months. Doc. 34-

6 at pp. 10-11, 18-69 and 18-33. Pursuant to the ADOC's Classification Manual[7], Defendant Parker recommended that Adams's custody be reclassified to close custody. Boyd also agreed that Adams's behavior warranted a reclassification to close custody. Doc. 34-6 at pp. 10-11, 34. After, ADOC's Central Review Board adopted Defendant Parker's recommendation, ADOC reclassified Adams's custody status to close custody on October 17, 2018. Thereafter, on November 26, 2018, ADOC transferred Adams to St. Clair Correctional Facility. Doc. 34-6 at pp. 10-11, 39.

### III. DISCUSSION

**A.     Exhaustion**

The Defendants raise the defense of exhaustion in this action.   In addressing the requirements of 42 U.S.C. § 1997e as to exhaustion, the Eleventh Circuit has

> recognized that "[t]he plain language of th[is] statute makes exhaustion a precondition to filing an action in federal court." *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000) (per curiam) (quoting *Freeman v. Francis*, 196 F.3d 641, 643–44 (6th Cir. 1999)). This means that "until such administrative remedies as are available are exhausted," a prisoner is precluded from filing suit in federal court. *See id.* (affirming dismissal of prisoner's civil rights suit for failure to satisfy the mandatory exhaustion requirements of the PLRA); *Harris v. Garner*, 190 F.3d 1279, 1286 (11th     Cir. 1999) ("reaffirm[ing] that section 1997e(a) imposes a mandatory requirement on prisoners seeking judicial relief to exhaust their administrative remedies" before ***filing*** suit in federal court), *modified on other grounds*, 216 F.3d 970 (11th Cir. 2000) (en banc); *Miller v. Tanner*, 196 F.3d 1190, 1193 (11th Cir. 1999) (holding that under the PLRA's amendments to § 1997e(a), "[a]n inmate incarcerated in a state prison . . . must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under section 1983."); *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999) (per curiam) (affirming dismissal of prisoner's civil suit for failure to satisfy the mandatory exhaustion requirements of § 1997e(a)); *Alexander v. Hawk*, 159 F.3d 1321, 1328 (11th Cir. 1998) (affirming dismissal of prisoner's *Bivens* action under § 1997e(a) for failure to exhaust administrative remedies prior to filing suit in federal court).

---

[7] In pertinent part, the Manual states that a close custody classification is warranted when an inmate exhibits unacceptable assaultive behavior by having three (3) disciplinaries for fighting within a 6-month period.  Doc. 34-6 at pp. 36, 37.

*Leal v. Georgia Dept. of Corrections*, 254 F.3d 1276, 1279 (11th Cir. 2001) (emphasis in original). Furthermore, the law is well-settled that "the question of exhaustion under the PLRA [is] a threshold matter that [federal courts must] address before considering the merits of the case. Because exhaustion is mandated by the statute, [a federal court has] no discretion to waive this requirement." *Myles v. Miami-Dade County Correctional and Rehabilitation Dept*., 476 F. App'x 364, 366 (11th Cir. 2012) (internal quotation marks omitted) (citing *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004) and *Alexander v. Hawk*, 159 F.3d 1321, 1325–26 (11th Cir. 1998)). The court will therefore "resolve this issue first." *Myles*, 476 F. App'x at 366.

When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. If the complaint is not subject to dismissal at this step, then the court should make specific findings in order to resolve the disputed factual issues related to exhaustion." *Myles*, 476 F. App'x at 366 (internal quotation marks omitted) (citing *Turner v. Burnside,* 541 F.3d 1077, 1082 (11th Cir. 2008). Consequently, a district court "may resolve disputed factual issues where necessary to the disposition of a motion to dismiss for failure to exhaust [without a hearing]. The judge properly may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535 (internal citations omitted). Based on the foregoing, the Eleventh Circuit specifically rejected the argument that "disputed facts as to exhaustion should be decided by a jury [or other factfinder]." *Id*.

Upon review of the Complaint, the Defendants' special reports and the undisputed evidentiary materials filed in support thereof and the Plaintiff's response to the special reports, the court concludes it is undisputed that Wexford staff has a grievance procedure at Bullock Correctional Facility to allow inmates to complain about any mental health treatment sought or received.  Doc. 19-1 at pp. 2-6; 19-17.  Plaintiff does not dispute that he failed to file any grievance.  Doc 40.  Rather, he argues that the grievance procedure at Bullock Correctional Facility was unavailable to him because his mental disability kept him from understanding the process, which was not clearly explained to him. Doc. 40.  However, the court is unpersuaded by this argument since Plaintiff fails to demonstrate that he made any efforts to complain informally – outside the grievance procedures -- to prison or health care personnel about his extended confinement or any mental health problems he experienced during this time.  *Id.*  Rather, the undisputed evidence demonstrates that Plaintiff never made any complaints about his lack of mental health treatment or the conditions of his confinement to any Defendant or other prison personnel who had contact with him while housed in Restrictive Housing.  Docs. 34-1 at p. 5, 34-2 at p. 5, 34-3 at p. 4, 34-4 at p. 3, 34-5 at p. 6, 34-6 at pp. 6 and 11, 34-7 at p. 5, 34-8 at p. 9.  Thus, the court could dismiss this action solely on the basis of Plaintiff's failure to exhaust; however, as an alternative basis for dismissal, the court hereafter will address the merits of the Plaintiff's Eighth Amendment medical treatment and confinement claims.

**B.    Deliberate Indifference Generally**

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).  With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an

objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the

official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an

objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th

Cir. 2001) *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007).  As to

the subjective elements, "the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .

The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and

unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation, cannot under our cases be

condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994);

*Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof

that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v.

Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's

interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that

characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that

conduct occurs in connection with establishing conditions of confinement, supplying medical

needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312,

319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of
> the substantial risk of serious harm in order to have had a "'sufficiently culpable
> state of mind."'"  *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v.
> Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . .
> Even assuming the existence of a serious risk of harm and legal causation, the
> prison official must be aware of specific facts from which an inference could be
> drawn that a substantial risk of serious harm exists - and the prison official must
> also "draw that inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . .  Each individual defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).  Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).  Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id*.

## C.   Deliberate Indifference to Medical Needs.

Adams alleges that the Medical Defendants acted with deliberate indifference to his medical needs when they failed to provide him medical treatment for his mental health conditions while in segregation.   Doc. 1 at pp. 2-3.  Further, he alleges that Defendants, as wardens or correctional officers, are responsible for ensuring that he receive appropriate medical treatment. These assertions entitle Adams to no relief.

To prevail on a claim of denial of medical treatment, an inmate must show the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000). Medical treatment of prisoners violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quotation marks and citation omitted). A prison official is not "deliberately indifferent" unless he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir.

1995) (finding, under *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment") (citation and internal quotations omitted). "A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016). Within the Eleventh Circuit, medical malpractice and negligence do not constitute deliberate indifference:

> Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

Thus, to demonstrate deliberate indifference to a serious medical need, Adams must show (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and his injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–1307 (11th Cir. 2009). To make this showing, Adams must establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (finding that for liability to attach defendant must know and disregard excessive risk to prisoner's health or safety).

16

Regarding the objective component, a plaintiff must first show an objectively serious medical need, followed by a response by defendants inadequate enough to constitute an unnecessary and wanton infliction of pain, not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law. *Taylor*, 221 F.3d at 1258. (Citations omitted). For the required subjective intent, a plaintiff must show the public official acted with an attitude of "deliberate indifference," which requires two things: an awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and drawing of the inference. *Taylor*, 221 F.3d at 1258 (internal citations and quotations omitted).

Thus, deliberate indifference occurs only when a defendant knows of and disregards an excessive risk to inmate health or safety; is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and draws that inference. *Farmer*, 511 U.S. at 837. An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Further, neither a difference of opinion on appropriate treatment nor the fact that the treatment was ineffective gives rise to a deliberate indifference claim. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding mere fact that inmate desires different mode of diagnosis does not amount to deliberate indifference); *Adams*, 61 F.3d at 1545 (stating that whether additional diagnostic techniques or forms of treatment should have been used "is a classic example of a matter for medical judgment" and not a basis for Eighth Amendment liability) (citation omitted).  Indeed, when medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent."  *Massey v. Montgomery County Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

1.  **Medical Defendants**[8].

Adams claims that the Medical Defendants denied him adequate medical treatment for his mental health conditions while housed in segregation.  The Medical Defendants adamantly deny they acted with deliberate indifference to Adams' medical needs during the time relevant to this Complaint or at any other time.  Indeed, the undisputed mental health records and affidavit testimony before the court demonstrate that Adams was referred to the stabilization unit on September 25, 2018, by a mental health nurse practitioner with a diagnosis of adjustment disorder with depressed mood.  Thereafter, he was examined by a psychiatrist who concluded that Adams' mental health symptoms were mild and that he had exaggerated complaints in an attempt to avoid segregation.  Thus, the examining psychiatrist recommended Adams' placement in restrictive housing which was approved by a reviewing nurse and reviewing Correctional Defendants. Adams was placed in restrictive housing on September 28, 2018.

Within a week after his placement in restrictive housing, Adams was examined by a licensed mental health professional from the Wexford mental health staff who concluded that he was stable and w a s  showing no signs of distress.   Adams denied any suicidal thoughts.  The mental health professional further noted that Adams did not suffer from an SMI.   Finally, the mental health professional cleared Adams for continued housing in restrictive housing.   Additionally, Wexford mental health professional, Defendant Kenton Turner, confirmed that Adams "was regularly assessed and his mental health needs were closely monitored" while at Bullock.   He further

---

[8]  The named Medical Defendants in this action include Wexford Health Authority and mental health professional, Kenton Turner. Defendant Mary Collins is licensed by the Alabama Board of Examiners in Counseling as an Associate Licensed Counselor and works for the Alabama Department Corrections as a Psychological Associate II at Bullock Correctional Facility. Even though she is not employed by Wexford as a mental health professional, her training and regular contact with Adams makes her testimony about his mental condition relevant.

opined that "Adams at all times received mental health care within the standard of care of mental health professionals."

Defendant Mary Collins, a Psychological Associate II at Bullock Correctional Facility, had regular personal contact with Adams and testified she conducted rounds in Bullock's restrictive housing unit approximately twice a week and completed logs in conjunction with these rounds.  She stated that she routinely observed Adams during these rounds and, to the extent he would speak with her, she interacted with him. She also testified Adams' mental health records confirmed her personal observations of numerous encounters between Adams and mental health professionals[9].  She further testified that she personally did not observe any negative effects on Adams' mental health during his placement in restrictive housing.  Finally, she testified that in her opinion Adams' condition did not meet the definition of an SMI either categorically or functionally.

Under the circumstances of this case, the court concludes that the course of evaluation and treatment undertaken by the Medical Defendants did not violate Adams' constitutional rights. Specifically, there is no evidence upon which the court could conclude that any member of the medical staff acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Rather, the evidence demonstrates repeated evaluations of Adams by mental health professionals and Department of Corrections personnel responsible for his housing and health.  Whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a

---

[9]  Defendant Clemons, who served as the Commander of Restrictive Housing, testified he performed regular walkthroughs of restrictive housing between September 28, 2018, and November 26, 2018, and confirmed Collins' testimony about her and licensed mental health professional's contact with Adams.  Specifically, he testified, that Defendant Collins, or a member of the Bullock mental health staff completed rounds through the restrictive housing unit most every business day.

classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). In addition, to the extent Adams claims the Medical Defendants should have pursued some other mode of treatment, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment). As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference. In addition, Adams has failed to present any evidence showing that the manner in which the Medical Defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded.

2. **Correctional Defendants.** To the extent Adams argues that the Correctional Defendants acted in a manner to prevent him access to treatment from professional medical personnel while incarcerated in the Bullock Correctional Facility, the Court concludes that this argument lacks merit. Indeed, it is clear from the medical records that the Correctional Defendants were not in any way involved in decisions regarding the mental health treatment provided to Adams, as these decisions are made solely by healthcare professionals employed by Wexford. Thus, Adams has failed to establish deliberate indifference on the part of the Correctional Defendants. Specifically, Adams has not demonstrated that these Defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Adams' health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the

inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Consequently, summary judgment is due to be granted in favor of the Correctional Defendants on Adams' claim alleging deliberate indifference arising from the actions of medical personnel in treating his mental condition.

Insofar as Adams seeks to hold the Correctional Defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that the Correctional Defendants exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the

discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949.  Thus, liability for actions of the Medical Defendants could attach to the other named Defendants only if these Defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that the Correctional Defendants did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Adams. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the evaluation and treatment of Adams based upon their professional judgment after assessment of his mental and physical condition. In light of the foregoing, the Correctional Defendants can be held liable for decisions of medical personnel only if they undertook actions which bear a causal

relationship to the purported violation of Adams' constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the Correctional Defendants, Adams must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Adams has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the Correctional Defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Adams has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these Defendants failed to take corrective action.  Rather, Adams was regularly evaluated and treated by mental health professionals and was also regularly monitored by Mary Collins, a Correctional Defendant with mental health training. Further, the undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the Correctional Defendants which resulted in deliberate indifference to Adams' mental health needs.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the Correctional Defendants with respect to liability based on the theory of respondeat superior. Furthermore, even had Adams presented a proper basis for the claims lodged against the Correctional Defendants, the evidentiary materials before the court, including affidavits and medical records demonstrate that health care personnel did not act with deliberate indifference to his medical needs. Accordingly, Adam's deliberate indifference claim made against Correctional Defendants based upon lack of mental health treatment fails.

**D.     Deliberate Indifference -- Challenge to Segregated Housing**

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346.  Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).  Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.  *Id*.  Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.  Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).  Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter,

and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004). As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. The court previously identified the applicable standard relevant to establishment of the objective and subjective elements of an Eighth Amendment claim. *See supra*. at pp. 13-17.

As previously noted, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). As the foregoing makes clear, mere negligence "does not justify liability under section 1983[.]" *Id*.

Consequently, to proceed beyond the properly supported motion for summary judgment filed by the Defendants, Adams must first demonstrate an objectively substantial risk of serious harm existed and "that the defendant[s] disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Johnson v. Boyd*, 568 F. App'x 719, 721 (11th Cir. 2014), citing *Caldwell*, 748 F.3d at 1100. If he establishes these objective elements, Adams must then satisfy the subjective component. To do so, Adams "must [show] that the defendant[s]

subjectively knew that [he] faced a substantial risk of serious harm.  The defendant[s] must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and [they] must also draw the inference." *Id*. (internal citation omitted).

> To survive a motion for summary judgment, a plaintiff must submit evidence that
> the defendant-official had subjective knowledge of the risk of serious harm.
> *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  In determining
> subjective knowledge, a court is to inquire whether the defendant-official was
> aware of a "particular threat or fear ***felt by [the] [p]laintiff***." *Carter v. Galloway*,
> 352 F.3d 1346, 1350 (11th Cir.2003) (emphasis added).  Moreover, the defendant-
> official "must be aware of specific facts from which an inference could be drawn
> that a substantial risk of serious harm exists - and the prison official must also draw
> that inference." *Id*. at 1349 (quotations omitted).).

*Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005).

Plaintiff challenges the Correctional Defendants' placement of him in restrictive housing

at Bullock between September 28, 2018 through November 26, 2018.  The Correctional

Defendants claim Adams' placement in restrictive housing was necessary to ensure the safety of

the other inmates at Bullock and to secure the operation of the facility.  The undisputed evidence

before the Court demonstrates that based upon Adam's disciplinary record, the ADOC and the

members of the Bullock Correctional Facility placed him in restrictive housing following his

release from the stabilization unit on September 28, 2018.

Defendant Warden Babers testified that as a direct result of Adams' extensive

disciplinary history, in early September 2018 members of ADOC's Classification Division

initiated the process of reclassifying Adams' custody status to close custody. She further

explained that generally she would not approve releasing an inmate from restrictive housing

while a reclassification to close custody was pending.  On October 1, 2018, Defendant Boyd

presided as the hearing officer at Adams' reclassification hearing where Adams was provided

the opportunity to speak.  Defendant Simone Parker, a Classification Specialist at Bullock,

presented evidence at the reclassification hearing of Adams' recent disciplinary history. Adams did not to present any evidence at the reclassification hearing. Adams's disciplinary history and classification summary confirm that he assaulted three (3) different inmates on three (3) different occasions within a period of six (6) months. Defendant Parker recommended that Adams' custody be reclassified to close custody. Boyd also agreed that Adams's behavior warranted a reclassification to close custody. After ADOC's Central Review Board adopted Defendant Parker's recommendation, ADOC reclassified Adams' custody status to close custody on October 17, 2018. Thereafter, on November 26, 2018, ADOC transferred Adams to St. Clair Correctional Facility.

Based upon the record medical evidence the court concludes that the Plaintiff has failed to demonstrate that a substantial risk of serious harm existed to him based upon his placement and stay in restrictive housing.  Further, the record makes clear that the Correctional Defendants did not ignore any potential risk.  Indeed, Plaintiff's condition was monitored regularly by Mary Collins, a DOC employee with mental health training.  Further, DOC had procedures in place to ensure Plaintiff was only placed in restrictive housing pursuant to policy and that this placement did not threaten his health during his two-month stay.  Indeed, Bullock's Restrictive Housing Review board policies and the custody/classification procedures in place at the time of the Plaintiff's complaint provided Plaintiff with opportunities to challenge his custody/classification and placement.  Thus, the Plaintiff failed to present evidence to satisfy the objective component of his Eighth Amendment claim against DOC officials.

With respect to the subjective component, each Correctional Defendant testified that they neither witnessed Adams' mental health suffering due to his placement in restrictive housing, nor did he make specific complaints to them or others who reported to them about any deterioration

of his condition due to his housing.  Docs. 34-1 at p. 5, 34-2 at p. 5, 34-3 at p. 4, 34-4 at p. 3, 34-5 at p. 6, 34-6 at pp. 6 and 11, 34-7 at p. 5, 34-8 at p. 9.  Accordingly, the Plaintiff failed to present evidence to satisfy the subjective component of his Eighth Amendment claim against DOC officials.   Thus, in light of the foregoing, summary judgment is due to be granted in favor of the Correctional Defendants on the claim alleging they subjected Adams' to cruel and unusual punishment by placing him in segregated housing from September 28, 2018 through November 26, 2018.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The Defendants' motion to dismiss and or for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the Defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the Plaintiff.

On or before **February 10, 2022** the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see*

*Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 27th day of January, 2022.

/s/ Charles S. Coody
UNITED STATES MAGISTRATE JUDGE